The next case up this morning is 412-0749, 412-0907. Web Innovations & Technology Services v. Department of Revenue. For the appellant is Kurt Schaffers. You are here, sir? For the appellee is Timothy McPike. Mr. Schaffers, you may proceed, sir. Good morning, mate. Pleased to report. My name is Kurt Schaffers. I am counsel for the appellant, Web Innovations & Technology Services. I'll be referring to that entity as WITS in the oral argument today for short. This case is an appeal of the denial by the Department of Revenue of WITS's application for charitable property tax and sales tax exemptions. The Department of Revenue found that WITS failed to satisfy the coercion factors which are used to show charitable use and charitable entity. WITS timely filed a complaint for administrative review, which was denied, and then both cases were timely appealed to this court. WITS asserted a variety of issues on appeal, but for the purposes of oral argument, unless the court has any specific questions with regard to some of the points, I'd like to confine oral argument to two issues. And those issues are the ALJ's conclusion that by requesting a fee for recycling services and requesting a donation for service hours for WITS's free computer program, the appellant failed to comply with COA services. The second issue is the ALJ's conclusion that WITS's use of its property was not a charitable use. I'd like to go over a brief factual summary to set up these two issues. With regard to WITS, it is a not-for-profit refurbisher and recycler of electronics. WITS collects and has property in Danville, Illinois. And at that property, it collects electronics through donations and recycling events. Those electronics are then taken in-house. They're refurbished, if they can be, so that they can be placed back into the community for reuse. Or they're broken down into their constituent parts, and those constituent parts are then recycled. And some of these parts have value, and those parts are sold. And WITS uses that money to pay its operating expenses. Individuals are asked for a fee when they want to donate a piece of electronics. That's not true for all electronics. It's true for anything smaller than a microwave, which we'll recycle for free. For larger electronics, and those containing toxic chemicals, WITS asks for a fee, and WITS uses that fee to pay basically the end recyclers of these toxic materials. The fee asked for from individuals and non-profits is less than the amount WITS must ultimately pay to these end recyclers. It also charges no fees to the library, schools, veterans, disabled individuals. WITS in 2009, the year it issued, had a fee waiver policy, where somebody came and said they were unable to pay the fee, they were allowed to recycle their electronics, and there was no proof required of inability to pay. The only thing WITS could not do this for was for cathode ray tubes, large televisions, large computer monitors. Because those electronics contain lead, and the amount of money WITS had to pay to these end recyclers was large enough that WITS could not be an ongoing and viable entity if it did not receive a fee from individuals for those particular electronics. With regard to the free computer program, one of WITS' programs that it had at the Danville location and at the St. Louis location, an individual could receive a computer with the donation of service hours. Now, these service hours consisted of things like sending faxes, making phone calls, helping out at collection events, sometimes helping with the demanufacturing process. In 2009, WITS would waive this service hour requirement if somebody provided some type of justification or proof of inability to donate those. And that would come in either the form of proof of low income status, proof of veteran or disability status or a doctor's note, or a letter requesting, basically providing a reason why they're not able to provide these service hours. Moving into my main points. First, with regard to the requests for these service hours or recycling fees. The parties, again, stipulated that this case was submitted to the administrative law judge by stipulation and documents. The parties stipulated that in 2009, WITS had a fee waiver policy. Again, no proof of inability to pay was required. ALJ explicitly found this in the decision, but found that this waiver policy was inadequate because of WITS' failure to advertise it and because it was unclear whether somebody actually utilized it. And was there evidence that any computers were given away according to the waiver policy? There was no evidence in the record of somebody making a request for a waiver other than there were 30 individuals who received a free computer through WITS' Christmas computer program. And in the record there are letters by individuals stating the reason why that they want a computer through this program. But in terms of the application process of submitting a letter or some type of other proof of low income status, something like that, no, there's nothing in the record on that issue. With regard to the requirement of advertising, they're not going to locate a case which requires, under Illinois law, that a fee waiver be advertised. The department and the administrative law judge cited to the Riverside Medical Center case. In that case, the court decided that that hospital was not providing charity service, but was actually just writing off bad debts. So it was actually billing people in certain instances, and when those debts were uncollectable, it would write them off. And the court did cite to Highland Park Hospital v. Department of Revenue and Alivio Medical Center v. Department of Revenue and noted that in these cases the court found that it was relevant to the determination that they were writing off bad debts that they did not advertise. So it wasn't the failure to advertise standing alone, which was a reason that the court found that they were not charitable institutions. It was the fact that they did not advertise supported their determination that they were actually just writing off bad debts as opposed to providing charity. And cases decided subsequent to those two cases, the Highland Park and Alivio Medical Center cases, specifically Randolph Street v. Zedner and Lena Community Trust Fund, found that the failure to advertise a fee waiver was not an indispensable requirement for charitable tax exemption. And both of those cases went on to find that even though they didn't advertise the fee waiver, that they were entitled to the exemption and noted that they were unable also to locate any specific Illinois cases which required the advertisement of a fee waiver. So based on the precedent that's available, Wits' failure to disseminate and advertise a fee waiver for the recycling services should not dispose of its application for charitable tax exemption. Is that a fact that it can be considered? Those cases which considered it, the ones that were able to locate it, the only ones I was able to locate, considered it in the context of making a determination that it was actually writing off bad debt as opposed to saying this charity care is available. What if I couple those things together? The absence of the advertising and the absence in the record of requests for fee waivers, the letters where somebody said I can't pay, putting those two together, I can draw some inferences from those. It seems to me it would be reasonable for me to consider that. Or reasonable for the department to say this is evidence or an inference of something. It's possible. The Lenin Community Trust Fund case is a case I think that's helpful on this point. In that case, it was stated that this was a community center which charged some fees to use things like conference rooms and things of that nature. In that case, that's also a case that provided that there was no advertising of this fee waiver policy. At the same time, the court found in that case, in the tax year in question, there was no waiver granted. And the court was persuaded by the fact that they had this undisputed fee waiver policy in place. So I think the facts of that are similar to the case here. It's that WITS had in place a fee waiver policy. If somebody came and said I can't pay this fee, they weren't required to show that they can't pay the fee. It was accepted and the person could donate their electronics without question. And regarding also the frequency of use, another case I think that's helpful, maybe not as much so as the Lenin Community Trust Fund case, is the Zedner case. In that case, there was unimpeached testimony by the director that they had essentially what he described as a pay as you go policy. Again, that was a performing arts center that would charge fees for some of the performances for individuals to attend. And that testimony was unimpeached. And there was no reference in that of how frequently it was used or if it was ever used at all. Along similar lines, the service hour requirement for this WITS's free computer program, the ALJ found that providing computers to the community is charitable, but requesting service hours takes away the charitable status because it's not a gift. And again, the Illinois cases, including Winnebago Home for example, state that charging a fee to individuals who are able to afford it, but still providing services to those who say that they can't does not feed charitable status. What's the standard of review in this case? The standard of review on these two particular issues, Your Honor. No, no. What's the standard of review in this case? We've raised a variety of different issues. And the standard of review for the stakes of finding a fact is against the manifest way of the evidence. The standard for mixed questions of law and fact, which the majority of our points on the PLR, is for clear error. And of course there are a few questions... Does that incorporate the deference to the expertise of the agency dealing with these kinds of questions and their experience? There is deference provided, but on the mixed questions of law and fact, if the court, after considering everything that's left, is convinced that there has been a mistake, then that can be sufficient reason to overturn the decision. Well, you point out a lot of explanations to us, but as Justice Connick put it, why can't all of these things put together lead the Department to the conclusion of breach that WITS isn't a charitable institution within the meaning of the statute? I think within the meaning of the statute, those cores and factors can be taken into account, and it's somewhat of a balancing test, and there's no particular factor. Some of the cases state that there are some factors that are entitled to more than others, but it still comes down to you take all these factors into account in making the determination. I agree that if there are... that then, considering the different aspects, that those things can be taken into account. As a first instance, it occurs to me that you're doing a fine job trying, after the fact, to explain away a lot of stuff. It might have been better if, in advance of all of this, some sharp lawyer like you was asked, gee, Mr. Schaffer, we're going to be seeking to have this be deemed a charitable institution so we won't have to pay tax. What can we do here to avoid problems that are likely going to come up? My guess is you probably could have provided some good answers, but the problem is, after the fact, it's kind of harder. I would agree with your honor on that. This is not WITS's first application for a charitable tax exemption. In fact, they've applied in the year 2007 for, and I believe that that's part of the record of the decision of the administrative law judge in that case. At that time, WITS's operations in Danville were just getting up and running, so there wasn't a lot of evidence of what was taking place, but those particular issues from that case, which the administrative law judge identified, WITS took its policies and tried to meet those particular deficiencies. And so, based on the case laws out there, WITS has tried to meet the requirements under the statute. What role should the degree or the extent to which WITS engaged in this recycling business play in comparison to the charitable giving away of computers? In other words, it seems like a big part of WITS, the major component of WITS, is the recycling here. That's true, and their mission overall is to keep electronics out of the landfills. It's a zero percent landfill policy. Nothing makes it there. So, focusing on that, how is that a charitable purpose or a charitable activity? In that regard, the administrative law judge, again going back, stated that while these were admittedly important services for the community, he found that it wasn't charitable because there was not a gift. The case law out there is that a gift can also be anything that relieves people from disease, suffering, or constraint, or otherwise lessens the burdens of government. Actually, in Pravina, the Supreme Court case, they state that the reason for exemptions in favor of charitable institutions is the benefit conferred upon the public by them and a consequent relief to some extent of the burden upon the state to care for and advance the interests of its citizens. And there was evidence provided to the administrative law judge in the form of documents from the Illinois statutes along with the U.S. Environmental Protection Agency. And these show that improperly disposing of electronics can lead to, when they're in landfills, these toxic chemicals resulting in environmental contamination. Not to mention the fact that these electronics sit in landfills. They're not biodegradable to take up space. I think most importantly is the Illinois enacted the Electronic Products Recycling and Reuse Act in 2008. And that act made certain findings and purposes of the statute, stating, again, it acknowledged that it was a fast-growing source of the solid waste stream and stated that a management is necessary to place the reuse and recycling of obsolete residential electronic parts as the preferred management strategy over incineration and landfill disposal. So the act also, on top of that, not just stating that Illinois needs to come up with a way to manage these electronics, it also provides for penalty provisions for those who violate some of the standards in there. And the Illinois Department, excuse me, Environmental Protection Agency, is the one charged with enforcing these penalties. So not only is what's, to a certain extent, relieving people from disease or suffering or constraint by providing a way to get potentially toxic substances out of the environment, but it's also, probably more importantly, lessening the burdens of government by providing a way for electronics to be recycled, such that instances where the Illinois Environmental Protection Agency somewhat lessens the burden on the enforcement or the monitoring of compliance with the statute. You used the word potentially, and I think that was smart, because a lot of these recycled products did not contain hazardous materials, correct? Correct. Therefore, these folks who gave these materials to WITS could just as easily have put them in the garbage and there wasn't any hazardous material to then end up in the landfill, correct? For those that would not be containing hazardous substances or not banned from landfills, that would be correct to have that option to do that. And do you have any information as to what the percentage was in terms of the recycling component of WITS activities as between those that contain hazardous materials versus those that did not contain hazardous materials? There was no information in the record of the breakdown of what the electronics consisted of. The only thing that was out there is that they recycled 1.75 million pounds of electronics in Danville and 6.5 million pounds total, including in St. Louis operations. And for those items that did contain hazardous materials, WITS actually charged the individual a fee, correct? It requested a fee for those items and would waive them, except for the cathode ray tubes, which contained lead. Complete waiver in all cases or partial waiver only for certain individuals? Complete waiver if someone said they were unable to pay. There was no requirement of proof of inability to pay. Okay, thank you, counsel. Your time is up. You will have the opportunity to address this again in rebuttal. Thank you, Your Honor. Okay, Mr. McPage? May it please the Court? Counsel? To answer Justice Harris's question, there is some information about the percentage of recycling fees versus the sales. It's in dollar terms. In the record at Volume 2, Page 11, Paragraph 3, which is cited I believe in Webb's reply brief, there was $10,500 worth of recycling fees charged at Danville. So that's some measure of the recycling fees. And we know from the record that there was $382,000 worth of sales at the combined operation, and that's at Record Volume 2, Page 43 and again at Page 49. There's three reasons, related reasons, why Webb has failed to clearly show that its recycling activities constitute charity. I'll summarize. The first reason is, as this Court said at Provena, there's nothing charitable about selling something to somebody. The $382,000 worth of sales were sales. And even though those sales arguably, to some extent, benefit the environment by keeping things out of the landfills, the fact that they are sales takes it out of charity, the charitable activity. To give you a for instance, if that were so, then any economic, any sales that had a positive charitable impact, if it was done by a not, excuse me, a positive environmental impact, if it were done by a not-for-profit, would then automatically become charitable. For instance, a solar power manufacturer, solar panel manufacturer, if it was a not-for-profit operation, and many of them turn out to be not-for-profit. If it were so, according to Webb, then any not-for-profit solar panel manufacturer would be charitable because solar power reduces the environmental burden of using coal, for instance. Or an electric car manufacturer. If Tesla were a not-for-profit, then under their argument, because electric cars are supposedly less environmental impact, then they would be charitable. So selling something to somebody is not a charitable activity, even if the impact is beneficial to do so. You can look to that proposition for the Salvation Army case, which is still good law, contrary to Webb's argument. In that case, the court ruled that accepting donated goods and then selling them was not a charitable activity, even though all the benefits went to the charitable work of the Salvation Army. Now in that case, they contrasted the Salvation Army's activity versus St. Vincent de Paul, which also operated a thrift store, and they noted that St. Vincent de Paul gave away most of its clothes to the poor, and there was only incidental sales. Here we have their argument. They're saying essentially selling is charitable because we keep things out of the landfill. That's just simply not the case. The second reason why they failed to prove that their activity is charitable, in regard to the pass-through recycling, that's the recycling that they charge fees for because they're environmentally hazardous, they simply failed to produce enough evidence. In the Three Angels case, and it's generally held, that to show a charitable operation, you have to show your line item detail. You have to have enough evidence for the court to look at the line item detail in the accounting and show that it's below cost. In Three Angels, I believe it was the sales of advertising time, or it could have been the sales of videotapes that were religious in nature. And there the court held, well, you had an expert witness, but you didn't have enough line item detail for us to tell if you're selling it below cost. If it's below cost, it's arguably charitable. If it's break-even, it's not for profit, but it's not charitable. Here, as they admit in their brief, you don't have any detail to know how much of these fees they're charging to individuals below their cost. They charge to individuals and to charitable organizations below their recycling fee costs. And to some they do with no fees at all. But they're charging businesses, and here you can't tell what they're charging businesses. It could be at cost or it could be above their cost. We don't know. And we don't know the ratio of the fees charged to businesses compared to the fees charged below cost to individuals. So there's no way this court can tell whether they're breaking even on their recycling fees. Are they below cost? In other words, are they taking in fewer fees than they are ultimately paying to the recycler? It's just not in the record. It was by stipulation, and the stipulation was insufficiently detailed. So that's the second reason. The third reason is it's not relieving any burden of government. Webb points to the Electronic Recycling Act, but all that act does is say that the government is going to regulate the recycling. The government is not going to engage in recycling, and the act anticipates that the actual recycling will be done by for-profit organizations. So clearly when the act itself says this function is going to be done by for-profit organizations, it is clearly not the act's policy that the government is going to engage in recycling. And in order to qualify as a reduction of a government burden, the activity has to be the type of activity that the government itself would be engaging in. Instances of that are in the Supreme Court's decision in Provena, they mentioned that Provena might have qualified for a charitable exemption on reducing the government burden because the government itself has undertaken to provide health care to certain individuals. And there was another case. This wasn't in my brief. I apologize. Duwinski v. Lowe's, which is at 306 Illinois Appellate 3rd, 504. That's a 1st District 1999 case. There the issue was the Cook County Amusement Tax, an exemption given to police and firemen organizations. They said that would be reducing the government burden. To allow that exemption would be permissible because that would reduce the government's burden of taking care of the widows and orphans of police and firemen. Now, in terms of the recycling part of the WITS operation you're suggesting, and I think it's a persuasive argument, but that's a non-charitable operation here just in terms of the way it was done and the numbers that are involved. There is, I would think you would agree, a portion of the WITS operation that is charitable in terms of giving away the computers. Is it up to the court to determine whether or not, in comparing the charitable versus non-charitable portions of the operations, that WITS should be entitled to an exemption under either of the taxes? In other words, should our focus be on the big picture, looking at the various components of the WITS operations to determine whether or not the charitable part of it blocks out the non-charitable part of it? Yes, Your Honor. Under the Sixth Methodist Old People's Home Criterion, which is that the property is primarily, exclusively, that means primarily used for a charitable purpose. And that's where this Court has to balance the amount of charitable activity going on versus the amount of non-charitable activity. And in this case? The dollars don't work out for them because they've only given away, first of all we have to say that the 20 computers for which they required service hours were not charitable because they were receiving something in return. As to the 30 that they gave away, the value of those 30 computers at $75 each worked out to be about $2,350, that's at the record on page 29, versus revenue, which includes both their sales revenue and their donations that they received, of $477,000. So $2,300 versus $477,000, clearly the property was not being used for charitable purposes, which is the Sixth Methodist Criterion. And there's another problem with the computer giveaways, which are the Third and the Fifth Methodist Criteria. The third one is dispensing charity to all who need and apply for it, and the fifth is that no obstacles are placed in the way. The problem with the computer programs, and by the way those two criteria were deemed by this Court in the Provena case to be essential criteria. You really can't mess those up and still get your charitable exemption. So the problem there was that, as this Court has already discussed with the appellant, that there was a waiver program with no evidence that any waiver was given in 2009. And even to qualify for the waiver, you had to explain why you couldn't work 55 hours a week to get a $75 computer. My answer would be I can't afford to work for $1.36 an hour. I have other things I need to do. So having to explain why you couldn't give 55 hours for a $75 computer is pretty much a burden, plus you had to attend an orientation program. There's no explanation of how the orientation, it's not like going to the soup kitchen and having to hear some religious stuff before you. Well, let me ask you a question, kind of the adverse of what I asked Mr. Schaffer, and that is given their goal to avoid tax consequences, could they have avoided all of this by avoiding the very, could they have achieved their goal by avoiding the various things, these nuance things that you've been pointing out to us? I think it's entirely possible. First, I think we have to acknowledge that giving electronics to people in this day and age who need them benefits those people. How can you operate without a computer today, without access to the Internet? And secondly, keeping things out of landfills, clearly it would be a benefit to the community. So clearly there's a basis there for their activities being qualified for an exemption. But they just didn't do it. You can't raise your money by reselling, that's clear. So they would have to be more of a St. Vincent de Paul and be giving away more than they're selling. Had the AG's office or the department been of a charitable spirit yourself and asked in advance, say, you know, you will be the people who will be judging us and opposing us if we don't do this right. If we want to do it right, what would be your suggestions? I think it might have suggested, well, don't do X, Y, and Z and other things. Yes, we would say give away more than you sell. And as far as the free, well, that would be giving away the free computers along with a bunch of other stuff. That would be the main thing. You have to give away a lot more than you sell. Selling destroys it, especially when selling is, you know, like I said, $3,000, $2,300 worth of giveaways versus $477,000 in revenue. If there are no further questions.  Thank you, counsel. Mr. Schavers. First, the argument about that selling destroys the selling of these for charitable purposes. The Salvation Army case dealt with a situation where there was just a thrift shop, and that thrift shop used its money to fund what was admittedly charitable purposes at another location. So it's kind of different than what we have here where what took place on the property was the actual collection, demanufacture, breakdown, refurbishment of electronics to keep them out of the landfills. And what could be sold was sold to fund its operations. The exemption statute itself was amended after that Salvation Army case, and a subsection was added which stated that a property could be exempt if it was exclusively used for distribution, sale, or resale of donated good and related activities and uses all the income from those activities to support the charitable, religious, or beneficent activities of the owner, whether or not they acquired the property. So sales does not destroy the charitable determination as long as those sales are not done with a view to a profit. Along those lines with a view to a profit, the Three Angels case, in that specific case, did find that there was no line item breakdown so that they could not make the determination whether sales were accomplished with a view to a profit. Even though there was no breakdown of how sales took place in this case, but the evidence in the stipulation stated that WITS initially began selling these materials because when it started its operations back in St. Louis, it initially was only refurbishing and putting them back in the community, but it was getting so much back, so many donations, that it had to do something with these. And it discovered that it could sell these certain parts to keep them out of the landfills, and in doing so, could cover its operating expenses. So there was no view to a profit, and I don't think that the Three Angels case specifically holds that in order to show that there's no view to a profit, you have to submit line item breakdowns. It's just in that case, the court found that because of what was being sold in that particular case had a propensity to be sold with a view to a profit. The court didn't find the testimony and the lack of a line item breakdown was sufficient. What do you believe is your most persuasive argument in support of the finding that the recycling activities were charitable? The most persuasive, I believe, is that what WITS is doing is a furtherance of Illinois' stated public policy under the Electronics, Reuse, and Recycling Act. And I don't agree with the Department's position on this, that that act is merely to set forth procedures for a commercially viable enterprise. I think that if you look at the findings and purpose section, some of the statements that are made in there, including a management of this waste stream, which is the fastest or a fast-growing stream of non-biodegradable, potentially toxic materials, and then providing that certain materials, if disposed of, people can be prosecuted or punished for those, I feel that that goes directly to this element of a gift, which states that this quote, otherwise reducing the burdens of government. And I think that by furthering the public policy of the state and, as you pointed out, Your Honor, potentially reducing the instances of having to track people down or prosecute them, I think is probably the strongest argument that it meets the cases interpreting the statutory definition of what is a charitable use. One other question, I'm sorry, and that is the ALJ found that there wasn't any evidence presented of the St. Louis facilities operations, and doesn't Provena II require that in a situation where there are multiple facilities that you present evidence of that other facility's operations? I think, first of all, Provena, I think, is somewhat distinguishable in that in that case, the court found that the applicant was a single hospital, whereas that single hospital was owned by a larger entity. And there was no evidence of what that larger entity's charitable expenditures or charitable activities were. In this case, which has two locations, but it's one entity. And, except for the brief, contrary to stating that there was no evidence as to the activities of Wits in St. Louis, I think that there was substantial evidence of that. In terms of, there was a, in the side of the briefs, there was a brochure that was put out into the community in Danville. This brochure was also used at the St. Louis operations, and it describes all of Wits' St. Louis operations in that. Not only that, but the tax return is consolidated, and so any of the expenditures that would be relevant are consolidated between those two entities, so the charitable expenditures, unlike in Provena, would be in that tax return submitted to the administrator of that location. Okay, thank you, counsel. I'll take this matter into advisement and be in recess for a few moments. Thank you.